UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

————————————————————————————X

EWART LAWRENCE, individually and on behalf of all
other persons similarly situated,

        Plaintiff,

    -against-

ADDERLEY INDUSTRIES, INC. and
CABLEVISION SYSTEMS CORPORATION,

        Defendants.

————————————————————————————X

CV-09-2309 (SJF)(ETB)

**OPINION & ORDER**

FEUERSTEIN, J.

    On May 29, 2009, plaintiff Ewart Lawrence ("plaintiff") commenced this putative collective and class action, individually and on behalf of all other persons similarly situated, against defendants Adderley Industries, Inc. ("Adderley") and CSC Holdings LLC i/s/h Cablevision Systems Corporation ("Cablevision") alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*, and the New York State Labor Law ("Labor Law") §§ 2 and 651.

    Cablevision now moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint against it. For the reasons stated herein, Cablevision's motion is granted.

I.    Background

1

A.    Factual Background[1]

1.    Cablevision's Relationship with Adderley

Cablevision is a telecommunications, media and entertainment company that, *inter alia*, provides cable, internet and telephone services to customers in the New York area. (Def. 56.1 Stat., ¶1; Plf. 56.1 Stat., ¶ 1; Declaration of Thomas Monaghan [Monaghan Decl.], ¶ 2). Cablevision maintains that "[a] significant portion of the installation, service, repair and removal work for [its] telecommunications services is not performed by [its] own employees; rather [it] contracts with vendors ["contractors"]* * * to perform most of th[o]se services. The Contractors, in turn, hire and maintain their own workforce of cable installers/technicians * * * ["technicians"] to assist them in completing the work." (Def. 56.1 Stat., ¶ 4; Monaghan Decl., ¶ 5).

Adderley is a wholly-owned subsidiary of Advanced Communications, Inc. ("ACI"), (Def. 56.1 Stat., ¶ 13; Plf. 56.1 Stat., ¶ 13; Transcript of Deposition Testimony of Mike Lall [Lall Dep.], pp. 29-30), and is one (1) of six (6) contractors that perform installation, service, repair and removal work on Cablevision's cable, internet and telephone systems in the Bronx. (Def. 56.1 Stat., ¶ 7; Plf. 56.1 Stat., ¶ 7; Monaghan Decl., ¶ 8). Adderley is not a parent, subsidiary or affiliate of Cablevision, or of any of Cablevision's parents, subsidiaries or affiliates. (Def. 56.1 Stat., ¶ 8; Plf. 56.1 Stat., ¶ 8; Monaghan Decl., ¶ 9). Nor does Adderley have any ownership interest in Cablevision, or in any of Cablevision's parents, subsidiaries, or affiliates, or vice versa. (Def. 56.1 Stat., ¶ 9; Plf. 56.1 Stat., ¶ 9; Monaghan Decl., ¶ 10).

---

[1] The factual allegations are derived from the parties' Rule 56.1 Statements and the affidavits and exhibits submitted in support of, and in opposition to, Cablevision's motion. The facts are not in dispute, unless otherwise indicated.

Cablevision's "Standard Installation and Services Agreement (Single Family Residences, Multiple Dwelling Units and Commercial Buildings)" ("SIS Agreement") with Adderley, dated December 1, 2006, as amended on January 15, 2007 and January 12, 2009, sets forth the terms under which Adderley provides technicians to install, service, repair and remove equipment for Cablevision's customers. (Def. 56.1 Stat., ¶¶ 10, 26; Plf. 56.1 Stat., ¶¶ 10, 26; Monaghan Decl., ¶¶ 11, 24; Lall Dep., pp. 141-2). Under the terms of the SIS Agreement, Adderley is required to perform work in accordance with Cablevision's procedures and specifications, (Monaghan Decl., ¶ 20; Lall Dep., pp. 186-7, 262-3, 277, 288), because a failure to complete work consistent with those specifications and procedures could create safety hazards for Adderley's technicians or Cablevision's customers, or lead to technical problems with Cablevision's equipment, (Def. 56.1 Stat., ¶ 22; Plf. 56.1 Stat., ¶ 22; Monaghan Decl., ¶ 20). Adderley is required to provide ongoing training to its technicians and to certify that all of its employees have been trained in accordance with Cablevision's specifications. (Lall Dep., pp. 223-7, 284; see Monaghan Decl., ¶ 38 ("Cablevision provides information to Adderley's management about Cablevision's systems and new updates to the systems or Cablevision products so that Adderley can perform under the [SIS] Agreement. But it is then entirely up to Adderley to decide how to communicate that information to its Technicians and to ensure that they are performing their duties appropriately.")). According to Cablevision, it does not train Adderley's technicians and does not determine which materials Adderley should use to train its technicians or how the training should be conducted. (Monaghan Decl., ¶¶ 37-8). Although Cablevision has the right to audit Adderley's training curriculum, it has never done so. (Lall Dep., p. 228).

Section 12(b) of he SIS Agreement provides, in relevant part, that Adderley "understands

3

and agrees that Cablevision shall not, for any purpose, be deemed to be the employer of any Employee of [Adderley] * * *. [Adderley] further agrees that, other than reserving the right to request that [Adderley] remove its Employees from a Cablevision Project * * *, Cablevision has no authority to affect the terms or conditions of the employment of any of [Adderley's] Employees." (Def. 56.1 Stat., ¶ 34; Plf. 56.1 Stat., ¶ 34). However, Adderley is not permitted to hire any subcontractors. (Lall Dep., p. 262).

Although the SIS Agreement does not prohibit Adderley from providing cable, telephone or internet installation, service, repair, removal or other work for companies other than Cablevision, Adderley's only client is Cablevision, (Def. 56.1 Stat., ¶ 11; Plf. 56.1 Stat., ¶ 11; Monaghan Decl., ¶ 12; Lall Dep., pp. 19-20, 60-1, 298-9, 307), and all of its revenue comes from Cablevision. (Lall Dep., pp. 261-2). Nonetheless, ACI, Adderley's parent company, does perform services for entities other than Cablevision. (Def. 56.1 Stat., ¶ 13; Plf. 56.1 Stat., ¶ 13).

Cablevision provides Adderley with work orders identifying the jobs to be completed and the "appointment windows" within which the work must be performed, but Adderley assigns particular technicians to the specific jobs and develops the routes for the technicians. (Lall Dep., pp. 121-2, 124, 151-2, 158; Monaghan Decl., ¶ 57). Cablevision requires Adderley's technicians to arrive at its customers' houses within the scheduled appointment window and prohibits Adderley from changing the appointment window. (Lall Dep., pp. 123, 159-60, 272). Nonetheless, Adderley is permitted to change which technician it assigns to perform the work within the scheduled appointment window. (Lall Dep., pp. 272-5; see Monaghan Decl., ¶ 56). Moreover, although Cablevision requires Adderley to provide it with a weekly "Workforce Planner" identifying every technician who will perform work that week, Adderley determines the

4

number of technicians it will assign to work. (Lall Dep., pp. 197-8, 296; see Monaghan Decl., ¶ 55).

Cablevision's work orders also inform Adderley what equipment its technicians need for each job. (Lall Dep., p. 231). Cablevision expects Adderley to complete all of the jobs given it on a particular day and tracks the jobs assigned to Adderley via its cable data system that records each technician's route and is updated as each job is completed. (Lall Dep., pp. 153-7). According to Lall, ACI's director of operations over Adderley, Adderley cannot "close a job" and move a technician to another job without Cablevision's approval, (Lall Dep., pp. 71-2, 167, 172-3), unless the job is a trouble call involving a problem with the customer's equipment, as opposed to a problem with Cablevision's service. (Lall Dep., p. 169). If an Adderley technician is unable to complete a job or to perform it properly, Adderley will "refer" the job to Cablevision for completion by one of its own technicians. (Id.) Upon completion of a job, Adderley's technician must have the customer sign a Cablevision acceptance or acknowledgment form and collects payment from the customer for Cablevision, both of which the technician submits to Adderley for submission to Cablevision. (Lall Dep., pp. 238-9; Def. 56.1 Stat., ¶ 77; Plf. 56.1 Stat., ¶ 77; see Monaghan Decl., ¶ 58).

Although Adderley does not need Cablevision's approval in order to perform work for Cablevision's customers other than what is contained in the work order, its technicians cannot perform any additional work without first obtaining a rate code change from Cablevision. (Monaghan Decl., ¶ 16; Lall Dep., pp. 127-8, 161, 286-8). For example, if a customer requests an additional cable box, modem or other equipment to be installed, Adderley's technician can perform that work without first obtaining Cablevision's approval, but the extra equipment would

5

not be operable until the technician obtained a rate code from Cablevision. (Lall Dep., pp. 163-4, 175-6). Similarly, if a customer requests an upgrade in the services provided by Cablevision, i.e., the customer originally requested only cable services but decided once the technician was there that he or she also wanted internet services, Cablevision would have to be contacted in order to upgrade its work order "so that that rate code [could] be added so that extra piece of equipment would be recognized by the electronic equipment and then added and then turned on." (Lall Dep., pp. 164-6, 174).

Adderley does not need Cablevision's approval before hiring a technician, but it notifies Cablevision when it hires a technician so that Cablevision can issue the technician an identification badge identifying him or her as a Cablevision contractor. (Lall Dep., pp. 133, 149-51, 193-4, 259-60; Def. 56.1 Stat., ¶ 58; Plf. 56.1 Stat., ¶ 58; Monaghan Decl., ¶ 42). A technician cannot work on a Cablevision job without an identification badge. (Lall Dep., pp. 193-4, 200). Cablevision also maintains a list of approved workers, i.e., individuals authorized to install its equipment, and any individual not on that list cannot install Cablevision equipment. (Lall Dep., p. 198). According to Lall, any individual hired and trained by Adderley as a technician, and approved as capable of doing the job, will be issued an identification badge by Cablevision and will be added to its list of approved workers. (Lall Dep., pp. 199-200). Cablevision can direct Adderley not to assign an individual who was previously employed by one of its other contractors and had been disciplined or fired for bad performance to a Cablevision project, (Lall Dep., pp. 202-4, 300-1, 307; see Monaghan Decl., ¶ 70), and has removed technicians from its list of approved workers, (Lall Dep., p. 240), but Adderley would be permitted to employ that technician in a different capacity. (Monaghan Decl., ¶ 70).

6

Cablevision also requires Adderley to perform certain pre-hiring screenings, i.e. drug tests and criminal background checks, before hiring a technician, (Monaghan Decl., ¶¶ 32-3; Lall Dep., pp. 209-10), to protect the safety of Cablevision's customers, whose homes Adderley's technicians will be entering, and Cablevision's equipment, to which the technicians have access. (Def. 56.1 Stat., ¶ 42; Plf. 56.1 Stat., ¶ 42).

Cablevision monitors the quality of the work Adderley technicians provide to its customers, (Lall Dep., pp. 215-6), and performs quality control inspections of approximately five percent (5%) of the work performed by Adderley's technicians, (Def. 56.1 Stat., ¶ 23; Plf. 56.1 Stat., ¶ 23; Monaghan Decl., ¶¶ 19-21). Although Cablevision uses post-call surveys and "other metrics" to evaluate Adderley's performance of its obligations under the SIS Agreement and will contact Adderley regarding any complaints about Adderley's technicians from its customers, Cablevision cannot tell Adderley to fire a particular technician. (Monaghan Decl., ¶¶ 17, 30; Lall Dep., pp. 98-9, 191-3). Moreover, Cablevision does not discuss an individual technician's performance directly with that technician and does not have the authority to increase or decrease a technician's compensation, approve vacation or sick leave, discipline a technician or direct the performance of a technician. (Lall Dep., pp. 266-70, 289, 294; Def. 56.1 Stat., ¶¶ 69, 84; Plf. 56.1 Stat., ¶¶ 69, 84; Monaghan Decl., ¶¶ 22, 34-5, 52, 62-3, 67). Nor does Cablevision provide any benefits to any of Adderley's technicians. (Def. 56.1 Stat., ¶ 45; Plf. 56.1 Stat., ¶ 45; Monaghan Decl., ¶ 36).

Adderley's technicians are required to wear uniforms while working, but Cablevision does not provide those uniforms and is not required to approve those uniforms, except to ensure the uniform's quality, i.e., it is not ripped, etc. (Lall Dep., pp. 212-5; Def. 56.1 Stat., ¶ 65; Plf.

56.1 Stat., ¶ 65; Monaghan Decl., ¶ 48) Both the Cablevision and Adderley logos are on the uniform. (Lall Dep., pp. 213-4).

The vehicles Adderley's technicians use are either provided by Adderley or owned by a particular technician, but have to comply with standards established by Cablevision and display a Cablevision sign along with Adderley's name and address. (Lall Dep., pp. 218-22, 290-2; Def. 56.1 Stat., ¶¶ 60-1, 63-4; Plf. 56.1 Stat., ¶¶ 60-1, 63-4; Monaghan Decl., ¶¶ 44-6). In addition, although Adderley's technicians install and service Cablevision equipment, since Cablevision service will not work on another company's equipment, they use either their own tools or tools provided by Adderley to install that equipment. (Lall Dep., pp. 289-90; Def. 56.1 Stat., ¶¶ 66, 68; Plf. 56.1 Stat., ¶¶ 66, 68; Monaghan Decl., ¶¶ 49-51).

### 2. Plaintiff's Employment

Plaintiff worked as a technician for Adderley for approximately ten (10) months, from May 2009 until March 2009, (Def. 56.1 Stat., ¶ 30; Plf. 56.1 Stat., ¶ 30; Plf. Dep., pp. 52, 77, 202-3), and received training at Adderley in order to perform his duties. (Def. 56.1 Stat., ¶ 33; Plf. 56.1 Stat., ¶ 33; Plf. Dep., p. 106). Each morning plaintiff reported to Adderley's office in the Bronx, which is at a different location than Cablevision's offices, to pick up his work orders and equipment. (Def. 56.1 Stat., ¶¶ 52-3; Plf. 56.1 Stat., ¶¶ 52-3; Plf. Dep., pp. 80, 107, 116-9). Cablevision did not provide plaintiff with any tools, uniform or van; rather plaintiff used his own vehicle and either his own or Adderley's tools, and wore a uniform provided by Adderley. (Plf. Dep., pp. 213-5). At the end of each workday, plaintiff completed a "cover sheet," indicating the quantity of jobs he performed and his "tech number," and submitted it to an Adderley dispatcher

8

at Adderley's office in the Bronx. (Plf. Dep., pp. 125-6). Plaintiff could only recall being on Cablevision's premises on two (2) occasions during his employment with Adderley for the purposes of attending a meeting at which the level of performance Cablevision expected from Adderley's technicians was discussed and obtaining his identification badge, respectively. (Def. 56.1 Stat., ¶¶ 54-6; Plf. 56.1 Stat., ¶¶ 54-6; Transcript of Deposition Testimony of Ewart Lawrence [Plf. Dep.], pp. 87, 90-2, 95-6). Plaintiff's paycheck said "Adderley" and he never received a paycheck from Cablevision. (Plf. Dep., pp. 207-8).

According to plaintiff, if a customer asked for whom he worked, he was instructed to say that he was a "representative" of Cablevision. (Plf. Dep., pp. 119-20, 226, 228-9). Plaintiff denied ever being instructed to identify himself as working for "Adderley, a Cablevision contractor." (Plf. Dep., pp. 119-20). Nonetheless, plaintiff was never instructed to say that he was employed by Cablevision either. (Plf. Dep., p. 229). According to Lall, Adderley's technicians are instructed to advise customers who ask that he or she is a contractor for Cablevision. (Lall Dep., pp. 133-4, 283).

Plaintiff's supervisor was Colin Lovelace ("Lovelace"), an employee of Adderley or ACI. (Def. 56.1 Stat., ¶ 81; Plf. 56.1 Stat., ¶ 81; Plf. Dep., pp. 23-5, 170). Lovelace, in turn, reported to Lall, an employee of Adderley or ACI. (Def. 56.1 Stat., ¶ 82; Plf. 56.1 Stat., ¶ 82; Plf. Dep., p. 25). Plaintiff complained to Lall and Lovelace about working overtime without pay, but never complained to Cablevision. (Plf. Dep., pp. 211-3). Cablevision did not provide plaintiff any employee benefits. (Plf. Dep., p. 213).

During his employment, plaintiff was repeatedly disciplined by Adderley without any knowledge or input by Cablevision. (Def. 56.1 Stat., ¶¶ 86, 94; Plf. 56.1 Stat., ¶¶ 86, 94; Plf.

Dep., pp. 68–70, 102-3, 205; Monaghan Decl., ¶ 69). Adderley ultimately terminated plaintiff's employment without any participation or input by Cablevision. (Def. 56.1 Stat., ¶¶ 92-3; Plf. 56.1 Stat., ¶¶ 92-3; Plf. Dep., pp. 203-5; Monaghan Decl., ¶ 68). Subsequently, plaintiff obtained employment for Falcon, another Cablevision contractor, and performed services for Cablevision. (Plf. Dep., pp. 205-7, 221).

Plaintiff could not recall ever previously claiming on any employment application, loan application or other document that he was employed by Cablevision. (Def. 56.1 Stat., ¶ 36; Plf. 56.1 Stat., ¶ 36; Plf. Dep., pp. 39-46, 57-8, 64-6).

B.     Procedural History

On May 29, 2009, plaintiff commenced this putative collective and class action, individually and on behalf of all other persons similarly situated, against Adderley and Cablevision alleging violations of the FLSA (first cause of action) and the New York State Labor Law (second cause of action).

Cablevision now moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint against it.

II.     Discussion

A.     Standard of Review

Summary judgment should not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

10

56(c). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); see Ricci v. DeStefano, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (Emphasis added) (internal quotations and citation omitted)). "A fact is material if it 'might affect the outcome of the suit under governing law.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci, 129 S.Ct. at 2677 (quoting Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

If the district court determines that there is a genuine dispute as to a material fact, the court must then "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," Spinelli, 579 F.3d at 166 (internal quotations and citation omitted); see also Aulicino v. New York City Dept. of Homeless Services, 580 F.3d 73, 79 (2d Cir. 2009), to determine whether there is a genuine issue for trial. See Ricci, 129 S.Ct. at 2677. A genuine issue exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809

(2d Cir. 2009). "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," F.D.I.C. v. Great American Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quotations and citation omitted), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id.; see also Spinelli, 579 F.3d at 166. Thus, the nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. Spinelli, 579 F.3d at 166 (internal quotations and citations omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).


B.    "Joint Employer"

The FLSA broadly defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 203(d).[2] "[F]ederal regulations and [Second Circuit] precedent recognize the possibility of joint employment for purposes of determining FLSA responsibilities." Barfield v. New York City Health and Hospitals Corp., 537 F.3d 132, 141 (2d Cir. 2008) (citing 29 C.F.R. § 791.2(a); Zheng v. Liberty

---

[2] Similar tests are applied to determine whether a party may be liable as an "employer" under both federal and state law. See, e.g. Gortat v. Capala Brothers, Inc., 257 F.R.D. 353, 367 n. 13 (E.D.N.Y. 2009); Velu v. Velocity Express, Inc., 666 F.Supp.2d 300, 306-7 (E.D.N.Y. 2009) ("Although slightly different that the FLSA inquiry, the standard for determining a worker's status as an employee or independent contractor under New York State Labor Law is similar, and accounts for some of the same factors). Accordingly, the following analysis applies to both plaintiff's federal and state law claims.

Apparel Co. ("Zheng I"), 355 F.3d 61, 66 (2d Cir. 2003)).

"[T]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts,' Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (internal quotation marks omitted), determined by reference not to 'isolated factors, but rather upon the circumstances of the whole activity' * * *." Barfield, 537 F.3d at 141 (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed.2d 1772 (1947)). "As a result, [the Second Circuit] has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." Id. at 141-2.

In assessing the "economic reality" of a particular employment situation, courts consider various factors "based on the factual challenges posed by particular cases." Barfield, 537 F.3d at 142. Initially, courts must "examine the degree of formal control exercised over a worker" by considering "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Barfield, 537 F.3d at 142, 143 (quoting Carter v. Dutchess Community College, 735 F.2d 8, 12 (2d Cir. 1984)). Those four (4) factors are "useful largely in cases involving claims of joint employment," Zheng I, 355 F.3d at 67 (internal quotations and citation omitted), and "can be *sufficient* to establish employer status," although they are not "*necessary* to establish an employment relationship." Id. at 71 (emphasis in original).

A finding that a putative joint employer does not exercise formal control over a worker does not end the inquiry however. See Zheng I, 355 F.3d at 69. Rather, the court must then

"assess whether an entity that lacked formal control nevertheless exercised functional control over a worker" by considering "(1) whether [the putative employer]'s premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the putative employer]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [putative employer] or (its) agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative employer]." Barfield, 537 F.3d at 143 (quoting Zheng I, 355 F.3d at 72).[3] "The court is also free to consider any other factors it deems relevant to its assessment of the economic realities." Zheng I, 355 F.3d at 71-2. In sum, there is "no rigid rule for the identification of an FLSA employer." Barfield, 537 F.3d at 143. Rather, courts must consider "'a nonexclusive and overlapping set of factors' to ensure that the economic realities test * * * is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." Id. (quoting Zheng I, 355 F.3d at 75-6).

Generally, "the question whether a defendant is a plaintiff's joint employer is a mixed

---

[3] Still other cases "distinguish between independent contractors and employees" by considering "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." Barfield, 537 F.3d at 142, 143 (quoting Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-9 (2d Cir. 1988)). These Brock factors, however, "do not bear directly on whether workers who are already employed by a primary employer are also employed by a second employer. Instead, they help courts determine if particular workers are independent of *all* employers." Zheng I, 355 F.3d at 67-8. Thus, under the circumstances of this case, where it is undisputed that plaintiff was employed by Adderley, a primary employer, the Brock factors are inapplicable.

14

question of law and fact. Such questions involve the application of a legal standard to a particular set of facts." Zheng v. Liberty Apparel Co., Inc. ("Zheng II"), 617 F.3d 182, 185 (2d Cir. 2010) (internal quotations, alterations and citation omitted). "Mixed questions of law and fact are especially well-suited for jury determination. . . ." Id. at 185-6 (internal quotations, brackets and citations omitted). Nonetheless, summary judgment is appropriate where application of the relevant factors to the facts of the case, viewed in the light most favorable to the plaintiff, compels the legal conclusion that the plaintiff was not an employee of a putative joint employer. See Zheng I, 355 F.3d at 76-7[4].

     1.     Formal Control

     Cablevision did not exercise sufficient formal control over plaintiff, or Adderley's other technicians, to be deemed their joint employer under the FLSA. Based upon the evidence in the record, there is no genuine dispute as to a material fact that Cablevision did not: (1) have the power to hire and fire plaintiff or Adderley's other technicians; (2) supervise and control plaintiff's, or the other technicians', work schedules or conditions of employment; (3) determine the rate and method of plaintiff's or the other technicians' compensation; or (4) maintain employment records on plaintiff or the other technicians.

     The requirement that Adderley's technicians meet Cablevision's installation

---

[4] Following the remand ordered in Zheng I, the district court denied the defendants' motion for summary judgment finding genuine disputes of material fact with respect to three (3) of the factors identified by the Second Circuit in Zheng I and the case proceeded to trial and jury verdict. Zheng II involved the defendants' appeal following the jury verdict on the issue, *inter alia*, of whether the district court improperly allowed the jury to determine the "ultimate legal question" of whether they were the plaintiffs' joint employer. Thus, the procedural posture of Zheng II is distinguishable from this case.

specifications "is entirely consistent with the standard role of a contractor who is hired to perform highly technical duties. It is in the nature of a contract that the contractor [Adderley] promises to deliver the performance bargained for by the client [Cablevision]. * * * [R]equiring a contractor [Adderley] to meet the client's [Cablevision's] technical specifications is not the type of 'control' which bestows 'employee' status on the contractor [Adderley]." Herman v. Mid-Atlantic Installation Services, Inc., 164 F.Supp.2d 667, 672 (D. Md. 2000), aff'd sub nom Chao v. Mid-Atlantic Installation Services, Inc., 16 Fed. Appx. 104 (4th Cir. 2001).

Nor does the requirement that Adderley's technicians wear uniforms and identification badges identifying themselves as being associated with Cablevision render them employees of Cablevision. See, e.g. Herman, 164 F.Supp.2d at 673. The requirement to wear such identifying materials "does not affect the economic reality of the relationship [between Adderley and Cablevision], * * * but merely allows consumers to be assured of [the technicians'] bona fides." Id.

Cablevision's drug testing and background-check policy also does not indicate an employee/employer relationship. Rather, "[i]t is only good business sense for [Cablevision] to attempt to insure that [the technicians sent to its customers' homes] are fit to [enter those homes]." Herman, 164 F.Supp.2d at 673.

Moreover, Cablevision's assignments of specific "windows" within which its customers must be serviced "stem[s] from the nature of the business and the need to provide reliable service and convenience to the consumers, not [from] the nature of the relationship between [Adderley] and [Cablevision] * * * [and] [does not] dictate a conclusion that [Adderley's technicians] are [Cablevision's] employees." Herman, 164 F.Supp.2d at 674.

16

A similar case seeking overtime wage payments under the FLSA was filed by cable technicians against a cable television provider, Comcast Corporation ("Comcast"), in the United States District Court for the District of Maryland entitled <u>Jacobson v. Comcast Corp.</u>, ___ F.Supp.2d ___, 2010 WL 3769120 (D. Md. Sept. 28, 2010). The following facts in <u>Jacobson</u> are substantially similar to the facts in this case: Comcast contracts with other companies ("the contractors") to hire technicians to perform installation of its equipment in a customer's home; the contractors perform all, or the vast majority of their work, for Comcast; the technicians are issued identification numbers and badges by Comcast; all of the equipment installed in the customers' homes belong to Comcast, but the contractors and their technicians own the tools and equipment needed to install that equipment; Comcast requires all prospective technicians to pass criminal background checks and drug screening tests before working on behalf of Comcast; the contracts between Comcast and the contractors require performance in accordance with Comcast's specifications and procedures; Comcast directs technicians to specific work sites and details the time frames in which jobs must be completed; Comcast utilizes a program permitting it to exercise real time monitoring of a technician's work to determine where they are, how long they are on site and what equipment they are utilizing and retains records of technicians' arrival and departure times; Comcast has the authority to "deauthorize" a specific technician, i.e., to strip the technician of his or her status as an "authorized contractor," thereby prohibiting that technician from performing any work on behalf of Comcast and effectively terminating that technician because the contractors only perform work for Comcast; and Comcast does not pay the technicians directly, instead it pays the contractors for each service completed by their technicians. <u>Id.</u> at * 1-2. Moreover, in <u>Jacobson</u>, unlike the present case, Comcast was required

to approve all prospective technicians prior to their hiring by the contractors and occasionally contacted technicians directly to assign them to particular jobs. Id., at * 1, * 2. To the contrary, Cablevision is not required to approve prospective technicians before Adderley hires them and there is no evidence in the record that Cablevision ever contacted plaintiff, or any other technician, directly in order to assign then to a particular job.

The District Court in Jacobson found, inter alia, that although Comcast "unquestionably plays a role in hiring and firing technicians[,] * * * [i]t is only in the context of quality control * * * that Comcast exercises power over the hiring or firing of technicians." ___ F.Supp.2d ___, 2010 WL 3769120, at * 4. Specifically, the court found, in relevant part, that:

> "[Contractors] are free to hire anyone they choose to hire, provided that the applicants do not have a criminal record or fail a drug test. Likewise, a[] [Contractor] has full authority to maintain the employment of the technicians, provided that a technician meets Comcast's quality performance standards, and to fire any technician that it believes should be fired, even if the technician meets Comcast's quality control standards."

Id., at * 4.

In addition, the Jacobson court found that although Comcast "maintains specific standards to which the [Contractors] and technicians must adhere, and regularly monitors the technicians to ensure that their performance satisfies Comcast's expectations[,] * * * Comcast is not responsible for the day-to-day management of the technicians." ___ F.Supp.2d ___, 2010 WL 3769120, at * 5. Specifically, the court found that Comcast "has no role in developing the [Contractors] human resources policies and does not dictate the technicians' working conditions, or determine the conditions upon which the technicians would receive payment. Th[o]se determinations are made by the [Contractors]." Id. The court further found significant:

> "that the control Comcast does exercise is in part designed to protect Comcast customers. * * * Technicians enter the residences of Comcast customers to perform installations. * * * Comcast's quality control procedures ultimately stem from the nature of their business and the need to provide reliable service to their customers, not the nature of the relationship between the technicians and Comcast. While Comcast's supervision and control may appear substantial in degree, it is qualitatively different from the control exercised by employers over employees."

Id. at * 6. Similarly, the court found that Comcast's retention of records regarding, *inter alia*, the technicians' arrival and departure times, employment status and history, criminal background and drug testing results "is only an extension of Comcast's control procedures. * * * The information reflected in th[o]se records is used to ensure that Comcast receives the services for which it is entitled, and that the individuals fulfilling them are authorized to do so." Id.

Furthermore, the Jacobson court rejected the plaintiffs' claim that Comcast had control over their wages because it payed the contractors on a per service basis and the contractors, in turn, paid their technicians on a per service basis. Id. at * 6. Instead, the court found that:

> "Comcast's involvement in the pay structure of the [Contractors] is typical of any client/independent contractor relationship. Comcast does not issue the technicians' pay checks, pay stubs, or W-2s, nor do the technicians submit pay records or timesheets to Comcast. * * * To find that th[e] arrangement [to pay contractors on a per service basis] places Comcast in control of [the technicians'] wages would dramatically expand the FLSA to subsume traditional independent contractor relationships. * * * The [Contractors], not Comcast, determine whether to pay their employees on a per service or salary basis, and at what rate."

Id.

The facts of this case are virtually indistinguishable from those presented in Jacobson and I find the district court's reasoning in that case to be persuasive. Accordingly, there is no genuine issue for trial regarding Cablevision's lack of formal control over Adderley's technicians.

19

## 2. Functional Control

Plaintiff and Adderley's other technicians do not work on Cablevision's premises and although they install and service Cablevision's equipment, they use their own or Adderley's tools to do so and do not "use," i.e., avail themselves of, Cablevision's equipment to accomplish the installation and service. Moreover, although Cablevision performs quality control inspections and reviews of the work performed by Adderley's technicians, it does not exercise any significant degree of supervision over plaintiff's or any particular technician's work. In addition, Adderley controls plaintiff's and its other technicians' work assignments and work schedule; Cablevision does not provide plaintiff or Adderley's other technicians with a uniform that they must wear; Cablevision's identification badges and vehicle signage clearly indicate that the technicians were employed by Adderley, a contractor of Cablevision; and Cablevision does not provide plaintiff, or Adderley's other technicians, with any type of employee benefits. Furthermore, plaintiff and Adderley's other technicians only perform work for Cablevision pursuant to the SIS Agreement, i.e., to the extent Adderley (or another contractor with whom they are employed) is hired to do so, and Adderley's business could "shift as a unit" from Cablevision to another cable media provider. In addition, although plaintiff and Adderley's other technicians perform discrete jobs that are integral to Cablevision's services, the degree of skill required to perform those jobs weighs against a finding of employer status. See, e.g. Chao, 16 Fed. Appx. at 107 (finding that the degree of skill required to install and repair cable equipment weighed against a finding of employee status); Freund v. Hi-Tech Satellite, Inc., 185 Fed. Appx. 782, 784 (11th Cir. 2006) (accord). The only relevant factor weighing in favor of a joint employment relationship is the fact that Adderley, although not its parent company ACI, works exclusively for Cablevision,

albeit by its own choice.

In determining that there was no triable issue of fact with respect to whether Comcast was a joint employer of the plaintiffs, the Jacobson court considered the following similar factors: (1) that Comcast does not provide technicians with uniforms, vehicles or tools, with the exception of a "star key" needed to unlock Comcast's boxes, and each contractor has its own premises out of which their technicians' work; (2) that although the contractors work primarily or exclusively for Comcast, "the absence of a single client base is not a proxy for joint employment because it is perfectly consistent with a legitimate subcontracting relationship," Id. at * 7 (internal quotations and citation omitted); see also Zheng I, 355 F.3d at 72 ("Although * * * the absence of a broad client base is * * * [not] a perfect proxy for joint employment (because [it] [is] * * * perfectly consistent with a legitimate subcontracting relationship), the factfinder can use th[is] readily verifiable fact[] as a starting point in uncovering the economic realities of a business relationship."); and (3) that "the technicians only work for Comcast to the extent their [Contractor] is hired to do so," Jacobson, 2010 WL 3769120, at * 7.

As noted above, the undisputed or uncontroverted facts of this case are virtually indistinguishable from the facts presented in Jacobson and I find the Jacobson court's well-reasoned findings and conclusions to be persuasive. Accordingly, I conclude that Cablevision is not the joint employer of plaintiff or Adderley's other technicians within the meaning of both the FLSA and the New York Labor Law. See also Santelices v. Cable Wiring, Inc., 147 F.Supp.2d 1313, 1326-8 (S.D. Fla. 2001) (finding that the cable company was not a joint employer of a contractor's technician where it exercised only minimal oversight of the technician's performance to ensure quality control and there was no evidence, *inter alia*, that the cable

21

company checked the technician's work on a daily basis, gave work commands or otherwise intervened in the performance of the technician's duties). Therefore, Cablevision's motion for summary judgment is granted and the complaint is dismissed in its entirety as against Cablevision.

III.    Conclusion

For the reasons stated herein, Cablevision's motion for summary judgment is granted and the complaint is dismissed with prejudice as against Cablevision. The remaining parties are directed to appear with authority or with persons with authority to settle this matter in my courtroom located at 1010 Federal Plaza, Central Islip, New York, 11722, on **March 4, 2011 at 11:00 a.m.** for a pretrial conference.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: February 11, 2011
       Central Islip, N.Y.